## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

DONAHUE FRANCIS,

            Plaintiff,

v.

KINGS PARK MANOR, INC., CORRINE
DOWNING, RAYMOND ENDRES,

            Defendants.

Civil Action No.: 14-cv-3555

**COMPLAINT**

**JURY TRIAL DEMANDED**

## I.      NATURE OF THE COMPLAINT

1.     This is an action for declaratory judgment, permanent injunctive relief, damages, costs, and attorneys' fees, alleging a continuing pattern of racially discriminatory conduct in violation of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, and the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601-19 ("FHA").  Plaintiff Donahue Francis, who is African American, also asserts causes of action for breach of contract and infliction of emotional distress.

2.     In May 2010, Plaintiff Donahue Francis leased an apartment in Kings Park Manor, a quiet residential complex located in Smithtown, New York.  Over the course of 2010 and 2011, Mr. Francis enjoyed his peaceful new neighborhood and bucolic surroundings.

3.     Starting in early 2012, however, Mr. Francis's experience at Kings Park Manor dramatically changed for the worse.  In February of that year, Mr. Francis's fellow Kings Park Manor tenant and next-door neighbor, Raymond Endres, approached Mr. Francis near the front door of his apartment and called him a "fucking nigger."

4.     This attack was just the opening salvo in a continuous series of verbal assaults of violent threats and racial epithets that would persist for more than eight months.  From February

until September 2012, Defendant Endres subjected Mr. Francis to egregious racial harassment, including the repeated use of racial slurs and threats to Mr. Francis's physical safety.

5.      Defendant Endres's conduct was so outrageous that it ultimately led to his arrest, prosecution, and conviction for harassment.

6.      Over a period of eight months, Mr. Francis notified Defendants Kings Park Manor, Inc. and Corrine Downing ("KPM Defendants") at least four times about Defendant Endres's pervasive and severe conduct.  Despite his repeated pleas for intervention, at no point did KPM Defendants investigate or intervene in any way.  In fact, KPM Defendants took no action even after Defendant Endres was arrested in August 2012 and charged with aggravated harassment.

7.      The KPM Defendants' failure to investigate Mr. Francis's complaints concerning Mr. Endres's violent racial harassment and concomitant failure to intervene on Mr. Francis's behalf violated his rights under the FHA and other civil rights statutes by creating a hostile living environment and interfered with his right to peaceful enjoyment of his home.  The FHA and other civil rights statutes prohibit a landlord from tolerating and/or facilitating racial harassment by a neighboring tenant.  Specifically, the FHA and the 1866 Civil Rights Act require a landlord to take reasonable steps to investigate allegations of racial harassment by a neighboring tenant once notified, as it would any alleged violation of a lease term.  The KPM Defendants took no steps to investigate clear evidence of racial harassment or protect Mr. Francis even after it was established that Mr. Endres had broken the law, let alone the terms of his lease.   The KPM Defendants could, for example, have terminated Mr. Endres's lease or evicted him.  Instead, they chose to do nothing.  As a result of Defendant Endres's harassing conduct, and the KPM Defendants' toleration and/or facilitation of that conduct, Mr. Francis was subjected to a racially

2

hostile living environment and suffered significant injury for which he now seeks redress in this Complaint.

## II.   JURISDICTION AND VENUE

8.     Jurisdiction is conferred on this Court by 42 U.S.C. § 3613(a)-(b) and by 28 U.S.C. §§ 1331, 1337, 1343 and 2201.  The Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the related state law claims for breach of contract, negligent infliction of emotional distress, and intentional infliction of emotional distress.

9.     Venue is proper in this District because the claims arose in the Eastern District of New York.

## III.   PARTIES

10.     Plaintiff Donahue A. Francis is an African-American man and self-identifies as black.  At all relevant times, Mr. Francis has resided at the Kings Park Manor Apartment Complex ("the Premises"), at 186 Ardito Avenue, Unit # 186, Kings Park, New York 11754 ("Unit 186").

11.     Defendant Kings Park Manor, Inc. is a New York Corporation ("Kings Park, Inc.").  Kings Park, Inc. owns Unit 186 and acts as the property management company for the Premises.  Kings Park, Inc. does business in the State of New York and does business at its office, located at 300 Ardito Avenue, Kings Park, New York 11754.

12.     Defendant Corinne Downing is the property manager at the Premises and is an agent of Kings Park, Inc.  As set forth in paragraph 6, Kings Park Manor, Inc. and Corinne Downing are referred to collectively as the "KPM Defendants."

13.     Defendant Raymond Endres, at all relevant times until January 28, 2013, resided at 184 Ardito Avenue, Unit # 184, Kings Park, New York 11754.

3

## IV.    FACTUAL BACKGROUND

### *2010: Mr. Francis Moves to Kings Park Manor*

14.     In late 2010, Mr. Francis, in search of a better housing situation, came upon a listing for an apartment vacancy in Kings Park Manor.

15.     Upon viewing the apartment and surrounding neighborhood, Mr. Francis felt at home.  Having lived in inner city urban communities during earlier parts of his life, the Kings Park neighborhood's quiet, tree-lined streets and the scenic, seemingly safe environment appealed to Mr. Francis.  He considered the apartment itself, with its clean, modern feel, the most luxurious he had ever considered renting.  Mr. Francis signed a lease soon thereafter. When Mr. Francis moved into his new apartment on May 1, 2010, he could not have been more excited.

### *February and March 2012: Harassment Begins*

16.     Mr. Francis's first 18 months at Kings Park Manor were uneventful.  In February 2012, however, Mr. Francis's experience at his new home rapidly changed for the worse when he encountered Raymond Endres, his next-door neighbor and fellow tenant, in front of their respective apartments.  Mr. Francis heard Mr. Endres say, "Jews, fucking Jews."  Mr. Endres then aggressively moved toward Mr. Francis and called him a "fucking nigger."

17.     Mr. Francis was shocked.  He felt a burst of fear.  Mr. Francis did not respond to Defendant Endres's comments.

18.     Shortly thereafter, on or about March 3, 2012, a similar incident occurred.  Mr. Francis was seated inside his apartment with the door open enjoying the fresh air.  Mr. Endres approached the front of their respective apartments and said "damn fucking Jews."  As he

approached, he looked towards Mr. Francis's open front door and at Mr. Francis and said, "fucking asshole." Mr. Francis understood this insult to be directed towards him.

19.     On or about March 10, 2012, Mr. Francis was in his apartment with the front door open. He overheard Mr. Endres and another tenant discussing Mr. Francis in derogatory terms.

20.     On or about March 11, 2012, Mr. Francis was in his apartment with the front door open. Mr. Endres threateningly approached him and called him a "nigger" several times. Mr. Endres stated "fucking nigger, close your god-darn door, fucking lazy, god-damn fucking nigger."

21.     At this point, Mr. Francis feared for his personal safety and called 911. In response to Mr. Francis's 911 phone call, Suffolk County Police Hate Crimes Unit Officer Patricia E. Keller came to the scene, interviewed witnesses, and spoke to Mr. Endres and warned him to refrain from uttering racial epithets at Mr. Francis.

22.     On March 11, 2012, as a result of this incident, Mr. Francis filed a police report.

23.     On or about March 20, 2012, Mr. Francis encountered Mr. Endres in the parking lot at the Premises. Before driving away, Mr. Endres repeatedly used the word "nigger" to insult and denigrate Mr. Francis.

24.     Beginning in March of 2012, Mr. Francis felt uncomfortable walking in the common areas at Kings Park Manor for fear of another confrontation with Defendant Endres. He felt afraid, anxious, and unwelcome in his own home. Mr. Francis now took care to look over his shoulder each time he unloaded groceries from his car.

***March 2012: Mr. Francis Files a Police Report, Which Results in First Notification of KPM Defendants***

25.     Upon information and belief, Suffolk County Police Hate Crimes Unit Officer Patricia E. Keller communicated with Kings Park, Inc., by and through Corinne Downing, concerning the March 2012 incidents involving Mr. Endres and Mr. Francis.

26.     Despite receiving information from law enforcement about Mr. Endres's harassing conduct towards Mr. Francis, KPM Defendants took no actions or steps to investigate or intervene.

27.     Mr. Francis continued to feel afraid, anxious, and unwelcome in his own home.

***May 2012: Continued Harassment and Second Notification of KPM Defendants***

28.     Mr. Endres's harassment of Mr. Francis continued unabated in May of 2012.  On or about May 14, 2012, Mr. Endres stood in front of Mr. Francis's front door and yelled "fuck you" because he apparently wanted Mr. Francis to close his front door.

29.     On or about May 15, 2012, Mr. Endres again approached Mr. Francis as he was leaving his residence.  He said "keep your door closed you fucking nigger."

30.     Defendant Endres then elevated his conduct to direct threats of racial violence. On or about May 22, 2012, Mr. Endres stated "I oughta kill you, you fucking nigger."

31.     Mr. Francis, fearing for his life, experiencing extreme fear and anxiety, again called the police and filled out a police report.

32.     Increasingly worried by Defendant Endres's behavior, Mr. Francis—by certified mail return receipt requested, dated May 23, 2012—notified the KPM Defendants of Mr. Endres's racial threats and harassment during March and May of 2012.  The May 23rd Letter provided details concerning the Suffolk County Police Hate Crimes Unit's investigation, including the names, badge numbers, and contact information of the involved officers.  Mr.

Francis also provided the relevant police reports.  The May 23rd Letter is attached hereto as Exhibit 1.

33.     As confirmed by the New York State Division of Human Rights Final Investigative Report and Basis of Determination[1], KPM Defendants received the May 23rd Letter.

34.     By both verbal communications between Officer Keller and Ms. Downing and the May 23rd Letter, Mr. Francis expressed to the KPM Defendants that Mr. Endres's remarks and conduct were unwelcome, based on race, and unreasonably interfered with his use and enjoyment of the Premises.

35.     The KPM Defendants took no actions or steps to investigate Mr. Endres's conduct and did not notify Mr. Endres that his conduct was in violation of his lease agreement.  Based on the police report and investigation, the KPM Defendants could have terminated Mr. Endres's lease or evicted him.  The KPM Defendants instead chose to do nothing; they took no actions or steps reasonably calculated to resolve Mr. Francis's complaints of harassment.

### *June Through August 2012: Arrest of Mr. Endres by Suffolk County Police Hate Crimes Unit and Third Notification of KPM Defendants*

36.     Through the summer months (and into the fall), Defendant Endres's harassing conduct persisted, as did KPM Defendants' failure to do anything about it.  On or about August 10, 2012, Mr. Endres again used racial epithets and foul language towards Mr. Francis, calling him, among other things, a "fucking nigger" and "black bastard."  Mr. Francis again contacted the Suffolk County Police Hate Crimes Unit.

---

[1] Mr. Francis filed an administrative complaint with the New York State Division of Human Rights against Defendants KPM and Downing on February 27, 2013 alleging unlawful housing discrimination on the basis of race. Following an investigation, the Division found Probable Cause to believe discrimination occurred on August 29, 2013.  The complaint was withdrawn prior to public hearing so that this action could be filed.

37.     Soon afterwards, Suffolk County Police arrested and charged Defendant Endres with, among other crimes, aggravated harassment, a class A misdemeanor.  Pursuant to N.Y. Penal Law § 240.30,

> A person is guilty of aggravated harassment in the second degree when, with intent to harass, annoy, threaten or alarm another person, he or she:
>
> * * *
>
> 3. Strikes, shoves, kicks, or otherwise subjects another person to physical contact, or attempts or threatens to do the same because of a belief or perception regarding such person's race, color, national origin, ancestry, gender, religion, religious practice, age, disability or sexual orientation, regardless of whether the belief or perception is correct.

38.     Hoping that management would now be compelled to investigate and intervene, Mr. Francis—by certified mail return receipt requested, dated August 10, 2012— notified the KPM Defendants of Mr. Endres's arrest for aggravated harassment and his continued use of racial and ethnic slurs.  The August 10th Letter is attached hereto as Exhibit 2.  The August 10th Letter also provided the name and address of Suffolk County Police Hate Crimes Unit Detective Lola Quesada.

39.     As confirmed by the New York State Division of Human Rights Final Investigative Report and Basis of Determination, KPM Defendants received the August 10th Letter.

40.     The August 10th Letter expressed to KPM Defendants that Mr. Endres's remarks and conduct were unwelcome, based on race, and unreasonably interfered with the use and enjoyment of the Premises.

41.     KPM Defendants still took no actions or steps to investigate Mr. Endres's conduct and did not notify Mr. Endres that his conduct was in violation of his lease agreement.  KPM Defendants took no actions or steps reasonably calculated to intervene as a result of Mr. Francis's complaints of harassment.

*September 2012: Fourth Notification of KPM Defendants*

42.     Even after his arrest and KPM Defendants' actual knowledge of the same, Defendant Endres's harassment of Mr. Francis continued unabated into September of 2012.  On or about September 2, 2012, Mr. Endres appeared at Mr. Francis's front door and inexplicably took a series of pictures of the inside of his apartment.  Mr. Francis again contacted the Suffolk County Police Hate Crimes Unit.

43.     Now desperate for management to intervene, Mr. Francis notified the KPM Defendants by certified mail (return receipt requested, dated September 3, 2012) of Mr. Endres's continued harassment.  The September 3rd Letter is attached hereto as Exhibit 3.

44.     As confirmed by the New York State Division of Human Rights Final Investigative Report and Basis of Determination, KPM Defendants received the September 3, 2012 Letter.

45.     The September 3rd Letter provided yet further notice to the KPM Defendants that Mr. Endres's remarks and conduct were unwelcome, based on race, and unreasonably interfered with the use and enjoyment of the premises.

46.     KPM Defendants took no actions or steps to investigate Mr. Endres's conduct and did not notify Mr. Endres that his conduct violated his lease agreement.  KPM Defendants took no actions or steps reasonably calculated to resolve Mr. Francis's complaints of harassment.

47.     As confirmed by the New York State Division of Human Rights Investigator, the property manager, Defendant Corinne Downing, contacted the owners of Kings Park, Inc. concerning Mr. Endres's discriminatory conduct and was told by the owners not to get involved.

48.     Despite repeated police involvement—including an arrest—and three certified letters from Mr. Francis, KPM Defendants did not investigate or intervene in any way on behalf of Mr. Francis.

### 2013: Mr. Endres Vacates the Premises and Pleads Guilty to Harassment

49.     Upon information and belief, Mr. Endres's lease expired on January 25, 2013 and he vacated the Premises on January 28, 2013.

50.     On April 2, 2013, Mr. Endres pled guilty to harassment under N.Y. Penal Law § 240.26(1).  Additionally, an order of protection was entered prohibiting Mr. Endres from having any contact with Mr. Francis.

### KPM Defendants' Obligations Under the Fair Housing Act and Civil Rights Laws

51.     Pursuant to the Fair Housing Act, § 1981 and § 1982, upon receiving notice of Defendant Endres's harassing conduct towards Mr. Francis, KPM Defendants had an obligation to investigate and to take prompt and effective remedial action.  KPM Defendants' toleration and/or facilitation of Mr. Endres's racial harassment created a hostile living environment and violated these statutory provisions.

52.     Courts have recognized claims for hostile living environment where (1) the conduct was unwelcome; (2) it was based on race or national origin; (3) it was sufficiently severe or pervasive as to alter the plaintiff's living environment and to create an abusive environment; and (4) the defendant knew or should have known of the harassment and took ineffectual action to correct the situation and thereby tolerated and/or facilitated the discrimination.

53.     Each of the four above elements is satisfied here.  Mr. Endres's conduct towards Mr. Francis was unwelcome.  The blatantly racist nature of Mr. Endres's comments reflects that his conduct was motivated by Mr. Francis's race.  The ongoing harassment over several months

10

was severe and pervasive, KPM Defendants knew about it; and by failing to take any action to intervene or otherwise enforce the terms of the lease and protect Mr. Francis's right to peaceful and quiet enjoyment of the property, they both tolerated and/or facilitated the racial harassment.

### KPM Defendants' Obligations Under the Lease

54.     In addition to any obligations imposed upon them by the Fair Housing Act and other federal laws, KPM Defendants had common law duties to investigate and intervene in order to protect Mr. Francis from neighbor harassment.  Their toleration and facilitation of Mr. Endres's actions interfered with Mr. Francis's peaceable enjoyment of his home, in violation of their lease agreement.

55.     Mr. Francis's and Kings Park, Inc.'s contractual rights and obligations flow from three interrelated documents.  First, on April 21, 2010, Mr. Francis and an agent of Kings Park Manor, Inc. signed a lease agreement.  Second, on May 1, 2010, Mr. Francis and Kings Park, Inc. signed a second lease agreement to rent Unit 186.  The May 1 Lease was signed by Defendant Corinne Downing, as "Landlord/Agent: Kings Park Manor."  Third, Mr. Francis participated in the Housing Choice Voucher Program, 42 U.S.C. § 1437f(o), *et seq.*,[2] commonly known as "Section 8."  Pursuant to the Housing Choice Voucher Program, the HUD Lease Addendum was annexed to the May 1, 2010 Lease Agreement and made a part thereof.  The April 21st and May 1st Lease Agreements and HUD Lease Addendum are attached hereto as Exhibit 4, incorporated herein, and collectively referred to as "the 2010 Lease."

56.     The 2010 Lease was renewed three times.  The renewals are dated as effective

---

[2] The Housing Choice Voucher Program was enacted in 1974 as Section 8 of the United States Housing Act.  On the federal level, the Department of Housing and Urban Development (HUD) administers the program, and it is administered locally by public housing agencies (PHAs).  *See generally* 42 U.S.C. § 1437f(o), *et seq.* and 24 C.F.R. § 982, *et seq.*

May 1, 2011, May 1, 2012, and May 1, 2013.[3]  The Lease Renewals are attached hereto as

Exhibit 5.

57.     Paragraph 12 of the April 21 Lease provides that "[b]y paying the rent and

observing all the terms and conditions herein, Tenant shall peaceably and quietly have, hold and

enjoy the Premises during the term of this Lease."  Ex. 4.

58.     KPM Defendants violated the May 2010 Lease provision identified in Paragraph

57.  By failing to investigate or otherwise intervene once notified of Mr. Endres's racially

harassing conduct, the KPM Defendants denied Mr. Francis peaceable and quiet enjoyment of

his apartment.   The KPM Defendants clearly had both the legal right and the factual justification

to terminate Mr. Endres's tenancy pursuant to his lease with Kings Park Manor, Inc. had they

chosen to do so.

59.     KPM Defendants were also in privity with the Community Development

Corporation of Long Island ("CDC-LI"), which administered Mr. Francis's Housing Choice

Voucher.  The CDC-LI provides Mr. Francis's subsidy directly to Kings Park, Inc.  This

payment arrangement and the rights and obligations attendant thereto are set forth in the Housing

Assistance Payments Contract (the "HAP Contract").  A sample HAP Contract is incorporated

herein and attached hereto as Exhibit 6.  Part B, Paragraph 9(a) of the HAP Contract prohibits

KPM Defendants from discriminating against "any person."

60.     KPM Defendants violated the HAP Contract by discriminating against Mr.

Francis by tolerating and/or facilitating a hostile environment.

61.     Upon information and belief, KPM Defendants had a lease with Defendant Endres

which prohibited him from engaging in objectionable conduct or behavior that interfered with

---

[3] The lease renewal effective May 1, 2013 in Mr. Francis's possession was not signed by Ms. Downing.

the rights and comforts of other residents.  Upon information and belief,  KPM Defendants had authority pursuant to this lease agreement with Defendant Endres to counsel, discipline, or evict him due to his continued harassment of Mr. Francis, which violated Defendant Endres's lease agreement and the law.  Once notified of the police findings, the KPM Defendants could, and should, have enforced the terms of Mr. Endres's lease by terminating his tenancy.  The KPM Defendants would have been justified in terminating the lease of a tenant for conduct far less egregious than a hate crime.

62.     Upon information and belief, at all relevant times, KPM Defendants did not warn or notify Mr. Endres that he was in violation of his lease as a result of his harassment of Mr. Francis.

63.     According to the New York State Division of Human Rights Investigator's File, the KPM Defendants have intervened against other tenants at Kings Park Manor regarding non-race-related violations of their leases or of the law.

### *KPM Defendants Are Jointly and Severally Liable*

64.     At all relevant times, Defendant Corinne Downing was an agent and/or employee of Defendant Kings Park Manor, Inc.

65.     Specifically, as alleged in Paragraph 47, Defendant Corinne Downing made the "owners" of the Premises aware of the alleged harassment and the "owners" instructed Ms. Downing "not to get involved."

66.     Further, as alleged in Paragraph 55, Defendant Corinne Downing signed the May 1, 2010 lease as "Landlord/Agent: Kings Park Manor."

67.     Kings Park Manor, Inc. failed to adequately manage, oversee, and supervise the actions of their agents and/or representatives, including Defendant Downing.

68.     At all times relevant to the events described herein, Defendant Downing, as an agent and/or employee of Kings Park Manor, Inc., acted within the scope of her employment as an agent, employee, and/or representative.  As an agent and/or employee, she carried out the discriminatory practices described herein (a) upon information, at the direction of, and with the consent, encouragement, knowledge, and ratification of Kings Park Manor, Inc.; (b) under Kings Park Manor, Inc.'s authority, control, and supervision; and/or (c) with the actual or apparent authority of Defendant Kings Park Manor, Inc.

69.     Defendants Kings Park Manor, Inc. is liable for the acts of their employees and/or agents, including those of Defendant Downing complained of herein.

### *Harm to Mr. Francis*

70.     Because of Defendants' actions, Mr. Francis was unable to fully use and enjoy the Premises despite having met his rent obligations each month.  Defendants deprived Mr. Francis of the full value of the Premises.  In 2012, Mr. Francis's rent was $1,075 per month.  Mr. Francis's Section 8 voucher paid $836 per month directly to Kings Park, Inc. while Mr. Francis paid $239 per month out-of-pocket.  Mr. Francis's out-of-pocket expenses are compensable harm.

71.     Beginning in February 2012 and continuing to the present, Defendants' actions and failure to act have caused Mr. Francis to suffer humiliation, embarrassment and emotional and physical distress, including, without limitation, shock, anger, frustration, panic, fear, and anxiety.

72.     This increased anxiety has resulted in Mr. Francis's loss of sleep from March 2012 to the present.  Mr. Francis's increased anxiety and loss of sleep are a result of the emotional and physical distress caused by Defendants, which continues to this day.

## V. CAUSES OF ACTION

### Count I (42 U.S.C. § 1981)

### As to All Defendants

73.      Paragraphs 1 through 72 are realleged and incorporated herein by reference.

74.      Mr. Endres's actions were sufficiently pervasive and severe so as to create a hostile environment based on Mr. Francis's race.  In addition to violating his civil rights, Mr. Endres's actions interfered with Mr. Francis's right to peaceably use and enjoy his home.

75.      The KPM Defendants tolerated and/or facilitated Mr. Endres's pattern of racist conduct, despite repeated specific requests to investigate Mr. Endres and intervene on behalf of Mr. Francis.  KPM Defendants failed to fulfill their lease obligations and interfered with Mr. Francis's right to peaceably use and enjoy his home.

76.      Mr. Endres's actions and the KPM Defendants' tolerance and/or facilitation of said acts were sufficiently pervasive and severe so as to create a hostile environment based on race in violation of Plaintiff's rights to make and enforce contracts on an equal basis regardless of race under 42 U.S.C. § 1981.

### Count II (42 U.S.C. § 1982)

### As to All Defendants

77.      Paragraphs 1 through 72 are realleged and incorporated herein by reference.

78.      Mr. Endres's actions were sufficiently pervasive and severe so as to create a hostile environment based on race.

79.      The KPM Defendants tolerated and/or facilitated Mr. Endres's pattern of racist conduct, despite repeated specific requests to investigate Mr. Endres and intervene on behalf of Mr. Francis.

15

80.     Mr. Endres's actions and the KPM Defendants' tolerance and/or facilitation of said acts were sufficiently pervasive and severe so as to create a hostile environment based on race in violation of Plaintiff's rights to use and convey real property on an equal basis regardless of race under 42 U.S.C. § 1982.

81.     Mr. Endres's actions and the KPM Defendants' tolerance and/or facilitation of said acts demonstrate a willful and gross disregard for the known rights of Mr. Francis.

### Count III (42 U.S.C. § 3604(b))

### As to All Defendants

82.     Paragraphs 1 through 72 are realleged and incorporated herein by reference.

83.     The KPM Defendants discriminated against Plaintiff in the terms, conditions, or privileges of the rental of his apartment.

84.     The KPM Defendants tolerated and facilitated Mr. Endres's pattern of racist conduct, despite repeated specific requests to investigate Mr. Endres and intervene on behalf of Mr. Francis.

85.     Mr. Endres's actions and the KPM Defendants' tolerance and/or facilitation of said acts were sufficiently pervasive and severe so as to create a hostile environment based on race in violation of Plaintiff's rights, as protected by the Fair Housing Act, 42 U.S.C. § 3604(b). Defendants subjected Mr. Francis to different terms and conditions on the basis of his race and color.

86.     Mr. Endres's actions and the KPM Defendants' tolerance and/or facilitation of said acts demonstrate a willful and gross disregard for the known rights of Mr. Francis.

## Count IV (42 U.S.C. § 3617)

## As to All Defendants

87.     Paragraphs 1 through 72 are realleged and incorporated herein by reference.

88.     The KPM Defendants tolerated and/or facilitated Mr. Endres's pattern of racist conduct, despite repeated specific requests to investigate Mr. Endres and intervene on behalf of Mr. Francis.

89.     Mr. Endres's actions and the KPM Defendants' tolerance and/or facilitation of said acts were sufficiently pervasive and severe so as to create a hostile environment based on race in violation of Plaintiff's rights, as protected by the Fair Housing Act, 42 U.S.C. § 3617. Mr. Francis's right to use and enjoy his home, after the assertion of his civil rights, was unlawfully interfered with on the basis of his race and color.

90.     Mr. Endres's actions and the KPM Defendants' actions and failure to act demonstrate a willful and gross disregard for the known rights of Mr. Francis.

## Count V (New York Executive Law § 296(5))

## As to KPM Defendants

91.     Paragraphs 1 through 72 are realleged and incorporated herein by reference.

92.     The KPM Defendants tolerated and/or facilitated Mr. Endres's pattern of racist conduct, despite repeated specific requests to investigate Mr. Endres and intervene on behalf of Mr. Francis.

93.     Mr. Endres's actions and the KPM Defendants' tolerance and/or facilitation of said acts were sufficiently pervasive and severe so as to create a hostile environment based on race in violation of Plaintiff's rights, as protected by the New York State Human Rights Law,

New York Executive Law § 296(5), Defendants subjected Mr. Francis to different conditions or privileges of rental on the basis of race and color.

94.     Mr. Endres's actions and the KPM Defendants' actions and failure to act demonstrate a willful and gross disregard for the known rights of Mr. Francis.

### Count VI (New York Executive Law § 296(6))

### As to All Defendants

95.     Paragraphs 1 through 72 are realleged and incorporated herein by reference.

96.     The KPM Defendants tolerated and/or facilitated Mr. Endres's pattern of racist conduct, despite repeated specific requests to investigate Mr. Endres and intervene on behalf of Mr. Francis.

97.     Mr. Endres's actions and the KPM Defendants' tolerance and/or facilitation of said acts were sufficiently pervasive and severe so as to create a hostile environment based on race in violation of Plaintiff's rights, as protected by the New York State Human Rights Law, New York Executive Law § 296(6), Defendants aided and abetted unlawful discrimination against Mr. Francis on the basis of race and color.

98.     Mr. Endres's actions and the KPM Defendants' actions and failure to act demonstrate a willful and gross disregard for the known rights of Mr. Francis.

### Count VII (Common Law Negligent Infliction of Emotional Distress)

### As to All Defendants

99.     Paragraphs 1 through 72 are realleged and incorporated herein by reference.

100.     The KPM Defendants had a duty to Mr. Francis based on their landlord-tenant relationship.

101.    The KPM Defendants' failure to investigate Mr. Endres's violent threats toward Mr. Francis and ultimately to intervene on Mr. Francis's behalf, constituted a breach of that duty.

102.    The KPM Defendants' failure to investigate and intervene in response to Mr. Endres's violent threats toward Mr. Francis constitutes extreme and outrageous conduct and caused Mr. Francis severe emotional distress.

103.    The KPM Defendants' failure to investigate and intervene upon receiving notice of Mr. Endres's egregious and illegal conduct, which included explicit threats of violence, placed Mr. Francis in imminent danger of physical harm, unreasonably endangered his physical safety, and caused him to fear for his physical safety.

### Count VIII (Common Law Breach of Contract)
### As to KPM Defendants Only

104.    Paragraphs 1 through 72 are realleged and incorporated herein by reference.

105.    The KPM Defendants' actions and failure to act, despite repeated specific requests to investigate Mr. Endres's egregious and illegal conduct and intervene on behalf of Mr. Francis, breached Part B of the HAP Contract as described in Paragraph 59.  Mr. Francis, as the HAP Contract's stated and intended beneficiary, was harmed as a result of the KPM Defendants' breach.

106.    The KPM Defendants' actions and failure to act, despite repeated specific requests to investigate Mr. Endres's conduct and intervene on behalf of Mr. Francis, breached KPM Defendants' agreement with Mr. Francis, as described in Paragraph 57 above, to ensure Mr. Francis's quiet enjoyment of his home.

**Count IX (Intentional Infliction of Emotional Distress)**

**As to Mr. Endres Only**

107.    Paragraphs 1 through 72 are realleged and incorporated herein by reference.

108.    Mr. Endres's conduct, including the use of violent threats and racial epithets, was extreme and outrageous and done with the intent to cause severe emotional distress.

109.    Mr. Endres's conduct resulted in Mr. Francis suffering severe emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

a.    a declaratory judgment finding that the actions of all Defendants violate 42 U.S.C. §§ 3604 and 3617,  42 U.S.C. § 1981 and § 1982;

b.    a declaratory judgment finding that the actions of KPM Defendants constitute negligent infliction of emotional distress and breach of contract;

c.    a declaratory judgment finding that the actions of Defendant Endres constitute intentional infliction of emotional distress;

d.    a permanent injunction prohibiting Defendants from continuing to engage in the illegally discriminatory conduct alleged in this Complaint, including, without limitation, ordering Defendants to take actions or steps reasonably calculated to resolve any and all complaints of neighbor-on-neighbor harassment on the basis of race, color, or any other ground prohibited by the Fair Housing Act of 1968 or the Civil Rights Act of 1866;

e.    compensatory damages in the amount of $2,832 to fully compensate Plaintiff for out-of-pocket rent paid during the period February 2012 through January 2013;

f.       compensatory damages in an amount that would fully compensate the Plaintiff for the

loss of enjoyment, humiliation, embarrassment, physical harm, emotional distress and

mental anguish caused by Defendants' violations of the law;

g.       punitive damages in an amount that would punish Defendants for the willful, wanton,

and reckless misconduct and indifference as alleged in this Complaint and that would

effectively deter the Defendants from future discriminatory behavior;

h.       reasonable attorneys' fees and costs; and

i.       all other relief deemed just and equitable by the Court.

### DEMAND FOR JURY TRIAL

Trial by jury is demanded on all issues.

Dated: June 5, 2014

Donahue Francis
PLAINTIFF

By Counsel:
                 Ryan C. Downer (RD3249)
                 John P. Relman*
                 Timothy M. Smyth*
                 RELMAN, DANE & COLFAX, PLLC
                 1225 19th St., NW, Suite 600
                 Washington, D.C. 20036-2456
                 Tel: 202-728-1888
                 Fax: 202-728-0848
                 E-mail: jrelman@relmanlaw.com
                        rdowner@relmanlaw.com
                        tsmyth@relmanlaw.com

                 *application for admission pro hac vice to be filed

                 Erik Heins (EH6320)

Long Island Housing Services, Inc.
640 Johnson Ave., Suite 8
Bohemia, New York 11716
Tel: (631) 567-5111
Fax: (631) 567-0160
E-mail: Erik@lifairhousing.org