**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
DONAHUE FRANCIS,

        Plaintiff,

    -against-

KINGS PARK MANOR, INC., CORRINNE
DOWNING, and RAYMOND ENDRES,

        Defendants.
--------------------------------------------------------X

                                      **MEMORANDUM OF**
                                      **DECISION AND ORDER**
                                      14-cv-3555 (ADS)(GRB)

**APPEARANCES:**

**Relman, Dane & Colfax PLLC**
*Attorneys for the Plaintiff*
1225 19th Street NW
Suite 600
Washington, DC 20036
      By: John P. Relman, Esq.
          Timothy Smyth, Esq.
          Yiyang Wu, Esq.
          Ryan C. Downer, Esq., Of Counsel

**Somer & Heller, LLP**
*Attorneys for the Defendant Kings Park Manor, Inc. and Corrine Downing*
2171 Jericho Tpke., Suite 350
Commack, NY 11725
      By:  Stanley J. Somer, Esq.
           Melissa Corwin, Esq., Of Counsel

**NO APPEARANCES:**

*The Defendant Raymond Endres*

**SPATT, District Judge**.

      On June 5, 2014, the Plaintiff Donahue Francis (the "Plaintiff") commenced this action

for a declaratory judgment, permanent injunctive relief, damages, costs, and attorneys' fees,

alleging a continuing pattern of racially discriminatory conduct in violation of the Civil Rights

1

Act of 1866, 42 U.S.C. §§ 1981, 1982, and the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601-19 (the "FHA"). The Plaintiff also asserts causes of action for breach of contract and negligent infliction of emotional distress.

On July 16, 2014, the Clerk of the Court noted the default of the Defendant Raymond Endres ("Endres"). The Plaintiff has yet to move for a default judgment against Endres.

On August 1, 2014, the Defendants Kings Park Manor, Inc. ("KPM") and Corrine Downing ("Downing")(collectively the "KPM Defendants") moved pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) to dismiss the complaint as against them for failure to state a claim upon which relief can be granted.

For the reasons set forth, the motion to dismiss filed by the KPM Defendants is granted in part and denied in part.

## I.    BACKGROUND

Unless stated otherwise, the following factual allegations are drawn from the complaint and construed in a light most favorably to the non-moving party, the Plaintiff.

A.  The Parties

The Plaintiff is an African-American male who self-identifies himself as black. At all relevant times, the Plaintiff resided at Kings Park Manor Apartment Complex (the "Complex"), at 186 Ardito Avenue, Unit # 186, Kings Park, New York 11754.

KPM is a New York corporation that owns Unit # 186 and acts as the property management company for the Complex.

Downing, an agent and employee of KPM, is the property manager of the Complex.

Endres, at all relevant times until January 28, 2013, resided at 184 Ardito Avenue, Unit # 184, Kings Park, New York, 11754.

B. <u>Factual Allegations</u>

On April 21, 2010, the Plaintiff and agents of KPM signed a lease agreement.

On May 1, 2010, the Plaintiff and agents of KPM signed a second lease agreement to rent Unit 186 at the Complex. The May 1, 2010 lease was signed by Downing as "Landlord/Agent: Kings Park Manor." The lease was renewed three times.

The Plaintiff participated in the Housing Choice Voucher Program, 42 U.S.C. § 1437f(o), *et seq.*, commonly known as "Section 8."

The Plaintiff moved into Unit # 186 at 186 Ardito Avenue. The Plaintiff's first eighteen months at the Complex were uneventful.

However, according to the Plaintiff, in February 2012, the Plaintiff heard his next door neighbor, the Defendant Endres, say "Jews, fucking Jews" and called him a "fucking nigger." (Compl., at ¶ 16.) The Plaintiff was shocked and fearful, but did not respond.

On March 3, 2012, Endres approached the front of their respective apartments and said "damn fucking Jews." (<u>Id.</u> at ¶ 18.) He looked toward the Plaintiff's open door and at the Plaintiff and said "fucking asshole." (<u>Id.</u>) The Plaintiff understood this insult to be directed towards him.

On March 10, 2012, the Plaintiff overheard Endres and another tenant discussing him in derogatory terms.

On March 11, 2012, Endres threateningly approached him and called him a "nigger" several times. Endres stated "fucking nigger, close your god-darn, fucking lazy, god-damn fucking nigger." (<u>Id.</u> at ¶ 20.) The Plaintiff phoned 911, and in response, Suffolk County Police Hate Crimes Unit Officer Patricia E. Keller ("Keller") arrived at the scene, interviewed

witnesses, and spoke to Endres, admonishing him about the alleged racial epithets towards the Plaintiff. The Plaintiff filed a police report.

On March 20, 2012, the Plaintiff encountered Endres in the parking lot at the Complex. Before driving away, Endres repeatedly used the word "nigger" to insult and denigrate the Plaintiff. The Plaintiff experienced fear and anxiety.

Upon information and belief, the Plaintiff alleges that Keller communicated with KPM, by and through Downing, concerning the March 2012 incidents. KPM allegedly took no actions or steps to investigate the situation.

On May 14, 2014, Endres stood in front of the Plaintiff's front door and yelled "fuck you," apparently because he wanted the Plaintiff to close his front door.

On May 15, 2012, Endres again approached the Plaintiff as he was leaving his residence and said "keep your door closed you fucking nigger." (Id. at ¶ 29.)

On May 22, 2012, Endres told the Plaintiff: "I oughta kill you, you fucking nigger." (Id. at ¶ 30.) The Plaintiff filed another police report.

By certified mail return receipt requested dated May 23, 2012, the Plaintiff notified the KPM Defendants of Endres' racial threats and harassment. The letter provided details concerning the Suffolk County Police Hate Crimes Unit's investigation, including the names, badge numbers, and contact information of the relevant officers.

The Plaintiff alleges that KPM could have terminated the Endres lease based on his conduct, yet they did not do so, nor did they take any actions or steps reasonably calculated to address the Plaintiff's complaints of harassment.

On August 10, 2012, Endres called the Plaintiff a "fucking nigger" and a "black bastard." (Id. at ¶ 36.) The Plaintiff again contacted the Suffolk County Police Hate Crimes Unit.

Soon after, the Suffolk County Police arrested Endres and charged him with, among other counts, aggravated harassment, a class A misdemeanor.

By certified mail return receipt requested dated August 10, 2012, the Plaintiff notified the KPM Defendants of Endres' arrest and his continued use of racial slurs. The Plaintiff also provided the name and address of a Suffolk County Police Hate Crimes Unit Detective, Lola Quesada. Again, according to the Plaintiff, KPM could have terminated the Endres lease based on his conduct, yet they did not do so, nor did they take any actions or steps reasonably calculated to address the Plaintiff's complaints of harassment.

On September 2, 2012, Endres appeared at the Plaintiff's front door and took a series of pictures of the inside of the Plaintiff's apartment. The Plaintiff again contacted the Suffolk County Police Hate Crimes Unit.

By certified mail return receipt request dated September 3, 2012, the Plaintiff notified the KPM Defendants' of Endres' continued harassment. Again, according to the Plaintiff, KPM could have terminated the Endres lease based on his conduct, yet they did not do so, nor did they take any actions or steps reasonably calculated to address the Plaintiff's complaints of harassment.

As confirmed by a New York State Division of Human Rights ("NYSDHR") Investigator, Downing contacted the owners of Kings Park, Inc. concerning Endres' discriminatory conduct and was told by the owners not to get involved.

The Plaintiff alleges, upon information and belief, that Endres' lease expired on January 25, 2013 and that he vacated the Complex on January 28, 2013.

On April 2, 2013, Endres pled guilty to harassment under New York Penal Law §

240.26(1).  In addition, an order of protection was entered prohibiting Endres from having any

contact with the Plaintiff.

C.  Procedural History

On June 5, 2014, the Plaintiff commenced this action.  As against all the Defendants, he

raises claims under the Civil Rights Act of 1866, the FHA, New York Executive Law § 296(5)

and § 296(6), and negligent infliction of emotional distress.  As against the KPM Defendants

only, the Plaintiff raises a claim of breach of contract.  As against Endres only, who has

defaulted, the Plaintiff raises a claim of intentional infliction of emotional distress.

As noted above, on August 1, 2014, the KPM Defendants moved to dismiss the

complaint as against them.

## II.    BACKGROUND

A.  The Legal Standard Governing a Rule 12(b)(6) Motion

Under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for "failure

to state a claim upon which relief can be granted."  To survive a Rule 12(b)(6) motion to dismiss,

a plaintiff must provide grounds upon which their claim rests through "factual allegations

sufficient 'to raise a right to relief above the speculative level.'"  ATSI Commc'ns, Inc. v. Shaar

Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,

555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  In other words, the complaint must allege

"enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music

Entm't, 592 F.3d 314, 321 (2d Cir. 2010)(quoting Twombly, 550 U.S. at 570, 127 S. Ct. 1955,

167 L. Ed. 2d 929).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

"[I]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" <u>Bebry v. ALJAC LLC</u>, 954 F. Supp. 2d 173, 176 (E.D.N.Y. 2013)(quoting <u>Leonard F. v. Israel Disc. Bank of N.Y.</u>, 199 F.3d 99, 107 (2d Cir. 1999)(quoting <u>Allen v. WestPoint–Pepperell, Inc.</u>, 945 F.2d 40, 44 (2d Cir. 1991)).

## B.  The Claims Under the Civil Rights Act of 1866

One portion of the Civil Rights Act of 1866 relevant to the Plaintiff's claim is codified at 42 U.S.C. § 1981, which provides in pertinent part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens. . . ." 42 U.S.C. § 1981(a).  Section 1982 of the Civil Rights Act of 1866 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982; <u>MHANY Mgmt. Inc. v. Inc. Vill. of Garden City</u>, 985 F. Supp. 2d 390, 410 (E.D.N.Y. 2013)(quoting Section 1982).

"To state a claim for racial discrimination under §§ 1981 or 1982, a plaintiff must allege intentional discrimination on the part of the defendant." <u>Samuels v. William Morris Agency</u>, No. 10 CIV. 7805 (DAB), 2011 WL 2946708, at *4 (S.D.N.Y. July 19, 2011)(citing <u>Mian v. Donaldson, Lufkin & Jenrette Sec.</u>, 7 F.3d 1085 (2d Cir. 1993)); <u>Perry v. State of New York</u>, No. 08 Civ. 4610 (PKC), 2009 WL 2575713 (S.D.N.Y. Aug. 20, 2009)("A plaintiff is required to set forth factual circumstances from which discriminatory motive can be inferred. . . . In the absence

of such allegations, dismissal at the pleading stage is warranted.")(internal citations omitted).

Indeed, for the Plaintiff's Section 1981 claim to withstand dismissal, "the events of the intentional and purposeful discrimination, as well as the racial animus constituting the motivating factor for the defendant's actions must be specifically pleaded in the complaint." Yusuf v. Vassar College, 827 F. Supp. 952, 955 (S.D.N.Y. 1993)(citation omitted), aff'd in part, rev'd in part on other grounds, 35 F.3d 709 (2d Cir. 1994).

In this action, the Court finds that the Plaintiff has failed to allege specific facts sufficient to support an inference that the KPM Defendants, rather than Endres, intentionally discriminated against him on the basis of his race. Indeed, the Plaintiff makes no allegation of derogatory remarks directed at him by a KPM agent, disparate treatment based on race, or any allegations of circumstantial evidence supporting an inference of discrimination on basis of race.

Here, "[the] naked assertion[s] by [the P]laintiff that race was a motivating factor [in the alleged failure to intervene by the KPM Defendants] without a fact-specific allegation of a causal link between [KPM Defendants'] conduct and the [P]laintiff's race [are] too conclusory." Hardin v. Meridien Foods, No. 98 Civ. 2268 (BSJ), 2001 WL 1150344 at *8 (S.D.N.Y. Sep. 27, 2001)(quoting Yusuf, 827 F. Supp. at 955-56)(citation omitted); see also Albert v. Carovano, 851 F.2d 561, 562 (2d Cir. 1988)("naked allegation" that the defendants selectively enforced college rules against the plaintiffs because they were black or Latino is "too conclusory to survive a motion to dismiss"). Accordingly, the Court grants that part of the motion by the KPM Defendants' dismissing the Section 1981 and Section 1982 claims as against them.

C.  The FHA claims

The FHA provides that "it shall be unlawful . . . to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . ." 42 U.S.C. § 3604(b).

The FHA also makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604[.]" 42 U.S.C. § 3617.

"Accordingly, the statute 'safeguards members of the protected class from coercion, intimidation, threats, or interference in the exercise or enjoyment of their Fair Housing Rights . . . [and] it protects third parties, not necessarily members of the protected class, who aid or encourage protected class members in the exercise or enjoyment of their Fair Housing Act rights.'" Wilson v. Wilder Balter Partners, Inc., No. 13-CV-2595 (KMK), 2015 WL 685194, at *8 (S.D.N.Y. Feb. 17, 2015)(quoting Frazier v. Rominger, 27 F.3d 828, 833 (2d Cir. 1994)(citations omitted).

As an initial matter, the Court notes that the Plaintiff also brings an FHA claim against the Defendant-in-default Endres, but that claim is not subject to the instant motion, so the Court does not address it.

"It is clear that under the FHA, owners of real estate may be held vicariously liable for discriminatory acts by their agents and employees." Glover v. Jones, 522 F. Supp. 2d 496, 506 (W.D.N.Y. 2007).  However, as described later, a novel question arises here because the alleged discriminatory acts were carried out by the Plaintiff's co-tenant, not anybody alleged to be a KPM agent or employee.

9

Further, "[i]t is unclear to what extent the FHA prohibits "post-acquisition" discrimination — that is, discrimination that occurs after a putative plaintiff acquires housing. District courts in this Circuit have held that § 3617 prohibits certain types of post-acquisition discrimination." Haber v. ASN 50th St. LLC, 847 F. Supp. 2d 578, 584 n. 3 (S.D.N.Y. 2012); see Davis v. City of New York, 902 F. Supp. 2d 405, 436 (S.D.N.Y. 2012)("I conclude that the law is best understood to prohibit post as well as pre-acquisition discrimination in the provision of housing-related services."); Ohana v. 180 Prospect Place Realty Corp., 996 F. Supp. 238, 239 (E.D.N.Y. 1996)(holding that FHA not only "protects individuals from discrimination in the acquisition of their residences because of race, color, religion, sex, familial status, or national origin, but also protects them," through § 3617, "from interference by their neighbors for such discriminatory reasons in the peaceful enjoyment of their homes"); Puglisi v. Underhill Park Taxpayer Ass'n, 947 F. Supp. 673, 696 (S.D.N.Y. 1996)(holding that nonminority landlord accusing neighborhood association of attempting to force him to evict his minority tenants had standing to sue under § 3617).

Also, "the Second Circuit has yet to rule on whether §§ 3604(a) and (b) also prohibit post-acquisition harassment, as the only substantive opinion touching upon this issue merely assumed for the purposes of argument, without actually holding, that a post-acquisition harassment claim could be made." Haber, 847 F. Supp. 2d at 584 (citing Khalil v. Farash Corp., 277 Fed. Appx. 81, 84 (2d Cir. 2008)("[a]ssuming, without deciding, that a plaintiff may state an FHA claim of discrimination against families with children based on a hostile housing environment theory").

"Courts in this Circuit have construed § 3604(b) of the FHA to prohibit the creation of a 'hostile environment' by individuals who have control or authority over the 'terms, conditions,

or privileges of sale or rental of a dwelling,' similar to the prohibition imposed by Title VII against the creation of a hostile work environment." Cain v. Rambert, No. 13-CV-5807 (MKB), 2014 WL 2440596, at *4 (E.D.N.Y. May 30, 2014)(emphasis added); Anonymous v. Goddard Riverside Cmty. Ctr., Inc., No. 96–CV–9198 (SAS), 1997 WL 475165, at *4 (S.D.N.Y. July 18, 1997)("The Second Circuit has repeatedly recognized that Title VII (employment discrimination) cases are relevant to Title VIII (housing discrimination) cases by virtue of the fact that the 'two statutes are part of a coordinated scheme of federal civil rights laws enacted to end discrimination.')(quoting Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 934 (2d Cir. 1988)).

In the employee-employer context, a plaintiff seeking to state such a hostile work environment claim must establish that (1) "[he or] she was subjected to harassment that was sufficiently pervasive and severe so as to create a hostile [housing] environment," Rich v. Lubin, No. 02 CIV. 6786 (TPG), 2004 WL 1124662, at *4 (S.D.N.Y. May 20, 2004), (2) the harassment was because of the plaintiff's membership in a protected class, Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014), and (3) "a basis exists for imputing the allegedly harassing conduct to the defendants," Rich, 2004 WL 1124662, at *4.

The main question here is, assuming a hostile housing environment claim is actionable under the FHA, what allegations are necessary under that statute to impute the conduct of a co-tenant to the landlord. The KPM Defendants contend that, even if a hostile housing environment theory of liability against landlords is viable under the FHA, a plaintiff must allege that the landlord or its agents acted, or failed to act, due to animus based on a protected category.

In the employee-employer context, "[a]n employer is liable for a hostile work environment in the workplace when the employer knew, or should have known, of the hostile

work environment but failed to take appropriate remedial action." D'Annunzio v. Ayken, Inc., No. 11-CV-3303 (WFK)(WDW), 2014 WL 2600322 (E.D.N.Y. June 10, 2014); see Duch v. Jakubek, 588 F.3d 757, 763 (2d Cir. 2009); Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000)(an employer is liable if it failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action). The sufficiency of an employer's remedial actions is evaluated under the totality of the circumstances. Duch, 588 F.3d at 766.

It is true that the FHA is often interpreted similarly to Title VII. However, while it is well-settled that a hostile work environment claim may be brought under Title VII, it is not clear that this theory is viable under all federal civil rights statutes. Indeed, whether such a claim is actionable under the Americans with Disabilities Act, 42 U.S.C. § 12111 et seq. (the "ADA") has not been decided yet by the Second Circuit. Giambattista v. Am. Airlines, Inc., 584 F. App'x 23, 26 n. 1 (2d Cir. 2014)("[t]his court has not yet decided whether a hostile work environment claim is actionable under the ADA").

In any case, as noted above, the districts courts in this Circuit have recognized a hostile housing environment claim against a landlord under the FHA only where the landlord "created" the conditions of harassment, rather than was merely notified about it and failed to take corrective action. This is presumably due to the well-known legal distinctions between the employer-employee relationship and the landlord-tenant relationship – including, that an employee is considered an agent of the employer while the tenant is not considered an agent of the landlord.

Indeed, "[n]either the Second Circuit nor district courts in this Circuit have opined on whether a landlord may be held liable under the FHA for failing to intervene in harassment

between tenants based on protected status." <u>Cain</u>, 2014 WL 2440596, at *6. In this regard, the Plaintiff's reliance on <u>Khalil</u> and <u>Rich</u> is misplaced. Both of those cases involved direct discrimination by a landlord or its agents against a tenant.

The case law on this question outside this Circuit is sparse. In support of its argument that a landlord's failure to intervene in tenant-on-tenant harassment is a violation of the FHA, the Plaintiff points to <u>Neudecker v. Boisclair Corp.</u>, 351 F.3d 361, 364 (8th Cir. 2003). However, that case does not necessarily support the Plaintiff's position. There, some of the harassment allegedly endured by the plaintiff-tenant came at the hands of children of the building managers, who "sent letters to [the] property manager . . . containing false counter-accusations as reprisal" for the plaintiff's complaints about harassment, and on one occasion, one of these children "pinned [the Plaintiff] against a wall after [the Plaintiff] had made another complaint." <u>Neudecker</u>, 351 F.3d at 363. The property manager also "falsely accused [the Plaintiff] of 'stalking' another tenant and threatened to evict him, and . . . threatened to evict [the Plaintiff] 'as reprisal' for his continued complaints about being harassed." <u>Id.</u> Unlike in this case, the Plaintiff ultimately surrendered his apartment as a result of the harassment. <u>Id.</u>

Thus, contrary to the Plaintiff's contention, <u>Neudecker</u> does not stand for the proposition that a tenant may assert an actionable claim for hostile housing environment under the FHA against the landlord based on harassment by a co-tenant where the landlord is simply made aware of the harassment but fails to take corrective action. <u>See</u> <u>Cain</u>, 2014 WL 2440596, at *5 (distinguishing <u>Neudecker</u> from the facts of that case in which the Plaintiff did not allege a "familial or other relationship to the landlord or manager of the building" or that the landlord contributed to the harassment).

13

However, to the extent that Neudecker could be construed to hold that a landlord's knowing failure to intervene in response to tenant-on-tenant harassment, without more, states a claim under the FHA, it did so without engaging in any substantive analysis of the text of the statute. Further, that reasoning was expressly rejected by the Supreme Court of Ohio in Ohio Civ. Rights Comm. V. Akron Metro Hous. Auth., 2008-Ohio-3320, ¶ 17, 119 Ohio St. 3d 77, 81, 892 N.E.2d 415, 419 (2008). Addressing a claim under a state housing statute, that court aptly distinguished the employer-employee relationship from the landlord-tenant relationship.

In Burlington Industries and Faragher, the United States Supreme Court noted that imposing liability on an employer who knew or should have known about co-worker harassment was an application of negligence liability. In Faragher, the Supreme Court noted in dicta that "combined knowledge and inaction may be seen as demonstrable negligence." Id. at 789, 118 S. Ct. 2275, 141 L. Ed. 2d 662. In Burlington Industries, 524 U.S. at 759, 118 S. Ct. 2257, 141 L. Ed. 2d 633, the Supreme Court noted, also in dicta, that "[a]n employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it."

2 {¶ 19} This liability of an employer for an employee's negligence derives from the established principles of agency law. In Burlington, the Supreme Court discussed employer liability for the tortious actions of an employee in the context of master-servant liability, noting that a master is not liable for the torts of a servant acting outside the scope of employment unless one of four factors exists. Id. at 758, 118 S. Ct. 2257, 141 L. Ed. 2d 633, citing 1 Restatement of the Law 2d, Agency (1958), Section 219(2). None of those factors apply to the liability of a landlord for the actions of a tenant.

34 {¶ 20} The agency principles that govern employer-employee liability have no parallel in the context of landlord-tenant disputes: "The relation of landlord and tenant in itself involves no idea of representation or of agency. It is a relation **420 *82 existing between two independent contracting parties. The landlord is not responsible to third persons for the torts of his tenant." Midland Oil Co. v. Thigpen (C.A.8, 1925), 4 F.2d 85, 91. See also Darnell v. Columbus Show–Case Co. (1907), 129 Ga. 62, 65, 58 S.E. 631 ("a tortious act done by one tenant to another tenant of a common landlord, without the authority, consent, or connivance of the landlord, is not the latter's tort, but the tort of him who does the act").

5 {¶ 21} The amount of control that a landlord exercises over his tenant is not comparable to that which an employer exercises over his employee. As the

appellants observe, a landlord does enjoy a measure of control through his ability to evict tenants. In the present case, the lease signed by Kaisk gives the AMHA authority to evict a tenant who disturbs other tenants' "peaceful enjoyment of their accommodations." The power of eviction alone, however, is insufficient to hold a landlord liable for his tenant's tortious actions against another tenant. See Siino v. Reices (1995), 216 A.D.2d 552, 553, 628 N.Y.S.2d 757 ("Absent authority to control the conduct of a third person, a landowner does not have a duty to protect a tenant from the conduct of another tenant. A reasonable opportunity or effective means to control a third person does not arise from the mere power to evict." [Citations omitted]). We therefore reject the argument that our precedent in the employment context applies to the cause of action at issue here.

Id. at 81-82.

In Lawrence v. Courtyards at Deerwood Association, Inc., 318 F. Supp. 2d 1133, 1144 (S.D. Fla. 2004), the plaintiffs were an African–American couple who sued their homeowners' association, property manager, and a neighbor, alleging that the homeowner association and the property manager allowed the neighbor to create a racially hostile housing environment in violation of Sections 3604 and 3617 of the FHA and 42 U.S.C. § 1982. Id. at 1136–38. The complaint alleged that the association addressed the complaints and problems of white homeowners, but refused to protect the plaintiffs' right to the quiet enjoyment of their property because they were African–American. Id. at 1138. The Lawrence court found that the plaintiffs failed to state a claim under Section 3617, reasoning that "[a] failure to act does not rise to the level of the egregious over conduct that has been held sufficient to state a claim under section 3617." Id. at 1144-45. Finally, the court held that the "defendants' failure to take action is not a 'direct and intentional act of interference' unless the Defendants had a duty to stop [the harassing] conduct." Id. at 1145 (S.D. Fla. 2004).

However, "the court in Lawrence appeared to leave open the possibility that if there had been evidence that the homeowners' association or property manager failed to act due to discriminatory motives, the plaintiffs would have been able to establish a Section 3617 claim."

Martinez v. California Investors XII, No. CV 05-7608 (JTL), 2007 WL 8435675, at *7 (C.D. Cal. Dec. 12, 2007).

In Fahnbulleh v. GFZ Realty, LLC, 795 F. Supp. 2d 360, 364 (D. Md. 2011), the Plaintiff-tenant was allegedly subjected to sexual harassment by a fellow tenant, and the landlord knowingly failed to intervene. The Plaintiff brought a federal action raising FHA and other claims. The landlord moved to dismiss the FHA claim on the ground that the statute did not authorize hostile-environment sexual-harassment claims for tenant-on-tenant harassment. The court denied the motion, finding that "there is no categorical rule that prevents FHA recovery for hostile-housing-environment sexual harassment based on tenant-on-tenant harassment." Id.

However, in so holding, the Court did not engage the text of the FHA, but rather drew upon general Title VII employer-employee principals. The Court primarily relied on a previous district court FHA decision in that Circuit, Williams v. Poretsky Mgmt., Inc., 955 F. Supp. 490, 496 (D. Md. 1996), which, in turn relied exclusively on Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983), partially abrogated by Mikels v. City of Durham, 183 F.3d 323 (4th Cir. 1999), a Title VII employer-employee case.

The Fahnbulleh Court did, however, acknowledge that, unlike a landlord-tenant relationship, a "clear agency relationship exists between the employer and the [employee] perpetrator." 795 F. Supp. at 364. The Court aptly responded to this distinction as follows:

> [E]mployer liability under Title VII is not limited to harassment perpetrated by employees. Employers can also be liable for the harassing conduct of a third party, such as a customer, "if the employer ratifies or acquiesces in the customer's demands." Hylind v. Xerox Corp., 380 F. Supp. 2d 705, 716 (D. Md. 2005). In some circumstances, employers are "required to protect [their] employees from illegal acts of [their] own employees and non-employees alike," and this duty "may require employers to exercise control over individuals not under [their] employ." Graves v. Cnty. Of Dauphin, 98 F. Supp. 2d 613, 620 (M.D. Pa. 2000).

795 F. Supp. at 364.

That said, the <u>Fahnbulleh</u> decision expressly limited itself to a rejection of a categorical rule that prevents FHA recovery for hostile-housing environment sexual harassment based on a tenant-on-tenant harassment. The Court specifically stated that it was not deciding "what factual circumstances justify holding landlords liable for tenant harassment, nor whether such circumstances are present in th[at] case." <u>Id.</u>

In that respect, <u>Fahnbulleh</u> is, in fact, consistent with <u>Lawrence</u> because, as noted above, the latter case "[left] open the possibility that if there had been evidence that the homeowners' association or property manager failed to act due to discriminatory motives, the plaintiffs would have been able to establish a Section 3617 claim." <u>Martinez</u>, 2007 WL 8435675, at *7.

Circling back to this Circuit, the Court notes again that the Second Circuit has not yet decided whether post-acquisition harassment is actionable under the FHA and, by extension, whether a landlord or property owner's knowing failure to intervene to combat such harassment, without more, is actionable against the landlord or property owner. Further, no district court in this Circuit has addressed the latter question.

With that in mind, the Court turns to the text of the relevant statutes: Sections 3604(b) and 3617 of the FHA. As noted above, Section 3604(b) makes it "unlawful . . . to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . ."

"Violations of section 3604(b) are recognized where such differences include showing a member of a protected class fewer apartments, quoting higher rents, quoting later days of availability, requiring applications and credit checks, or representing apartment features differently (e.g., 'a one bedroom for the white tester; black tester told unit is really small')." <u>Fair</u>

Housing Justice Center, Inc. v. Broadway Crescent Realty, Inc., No. 10 Civ. 34(CM), 2011 WL 856095, at *6 (S.D.N.Y. Mar. 9, 2011). They also include making an apartment available to a white tenant and making a non-white tenant wait for an apartment to become available at a later date, Williamsburg Fair Housing Committee v. New York City Housing Authority, 493 F. Supp. 1225, 1248 (S.D.N.Y. 1980)("When the staff filled a vacancy in a White-designated apartment by going down the list to find the next White family, they would be denying the apartment to the non-White families passed over. Such a non-White family would, at least for a time, have been denied an apartment for which it was eligible. Stated differently, that family would have been discriminated against in the privileges of a rental."), and falsely stating to a black customer that no homes are for sale, see Village of Bellwood v. Dwivedi, 895 F.2d 1521 (7th Cir. 1990)(stating that this conduct constitutes discrimination on racial grounds against the person in the provision of real estate services).

In addition, as noted above, Section 3617 makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other persons in the exercise of enjoyment of any right granted by section [3603, 3604, 3605, and 3606 of this title.]" Typically, "[i]n order to prevail on [a] § 3617 claim, [a] Plaintiff must show that: (1) she is a member of a protected class under the FHA, (2) she was engaged in the exercise or enjoyment of her fair housing rights, (3) Defendants were motivated in part by an intent to discriminate, and (4) Defendants coerced, threatened, intimidated or interfered with Plaintiff on account of her protected activity under the FHA." Lachira v. Sutton, No. 305CV1585 (PCD), 2007 WL 1346913, at *18 (D. Conn. May 7, 2007). The Lachira Court assumed, following Seventh

Circuit precedent, that "a showing of intentional discrimination is an essential element of a §

3617 claim." Id. at n. 18.

Fairly read, the text of both Section 3604(b) and Section 3617 of the FHA, and the above-

mentioned cases interpreting those statutes, require intentional discrimination on the part of a

Defendant in order to state a claim under those provisions. The Court identifies no compelling

reason why that requisite showing is also not necessary for a "hostile housing environment"

claim, assuming, without deciding, such a claim is actionable against a landlord or property

owner under the FHA. Such a holding is consistent with the Neudecker, Lawrence, and

Fahnbulleh cases decided outside this Circuit.

The Court recognizes that all the Circuits, including the Second Circuit, have recognized

a claim of disparate impact under Section 3604(a) of the FHA, which does not require proof of

intentional discrimination, MHANY Mgmt. Inc. v. Inc. Vill. of Garden City, 985 F. Supp. 2d

390, 424 (E.D.N.Y. 2013)(following bench trial, finding Village and Board of Trustees liable

under FHA under both theories of disparate treatment and disparate impact); Tsombanidis v. W.

Haven Fire Dep't, 352 F.3d 565, 574 (2d Cir. 2003)(applying disparate impact theory under the

FHA), though the viability of such a claim is set to be resolved by the Supreme Court this term in

Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 46, 189

L. Ed. 2d 896 (2014)(granting writ of certiorari). In any event, here, the Plaintiff does not bring

a disparate impact claim under Section 3604(a) against the KPM Defendants, nor, on these facts,

could he plausibly do so.

In sum, the Court concludes that, assuming, without deciding, that a "hostile housing

environment" claim is actionable against a landlord or property owner under the FHA, a question

unresolved at this time by the Second Circuit, such a claim would require allegations of

intentional discriminatory conduct, or failure to intervene, by the landlord or property owner based on a protected category. Turning to whether the Plaintiff has adequately done so in this case, the Court concludes that he has not.

To survive a motion to dismiss under Rule 12(b)(6), "the events of the intentional and purposeful discrimination, as well as the racial animus constituting the motivating factor for the defendant's actions must be specifically pleaded in the complaint." <u>Nelson v. Brown</u>, No. 13-CV-3446 (KAM)(MDG), 2014 WL 4470798, at *3 (E.D.N.Y. Sept. 10, 2014)(citation and quotation marks omitted). Again, "naked assertions by plaintiffs that race was a motivating factor without a fact-specific allegation of a causal link between defendant's conduct and the plaintiff's race are too conclusory." <u>Poles v. Brooklyn Cmty. Hous. & Servs.</u>, No. 11 CIV. 4796 (BMC), 2012 WL 668910, at *3 (E.D.N.Y. Feb. 29, 2012).

The Court finds that, on the facts in this case, that the Plaintiff alleges no basis for imputing the allegedly harassment conduct to the KPM Defendants as opposed to Endres, or that the KPM Defendants failed to intervene on account of their own racial animus toward the Plaintiff. Accordingly, the Court grants that part of the motion by the KPM Defendants dismissing the Plaintiff's FHA claims against them.

D. The New York Executive Law Claims

The New York Executive Law, with exceptions not pertinent here, contains provisions prohibiting housing discrimination similar to those in the FHA:

It shall be an unlawful discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent of, or other person having the right to sell, rent or lease a housing accommodation, constructed or to be constructed, or any agent or employee thereof:

(2) To discriminate against any person because of race . . . in the terms, conditions or privileges of the sale, rental or lease of any such housing

accommodation or in the furnishing of facilities or services in connection therewith.

N.Y. Exec. Law § 296(5)(a)(2).

Claims under the FHA and New York Executive Law § 296 are "evaluated under the same framework." Olsen v. Stark Homes, Inc., 759 F.3d 140, 153 (2d Cir. 2014)(citation and quotation marks omitted); see Barkley v. Olympia Mortgage Co., No. 04–CV–875 (RJD)(KAM), 2007 WL 2437810, at *18, 2007 U.S. Dist. LEXIS 61940, at *56–57 (E.D.N.Y. Aug. 22, 2007)("the standard relevant to [the NYHRL] claims parallel those applicable under the Fair Housing Act").  Thus, the Plaintiff's claim under New York Executive law § 296(5)(a)(2) against the KPM Defendants fails as a matter of law for the same reason the FHA claims do, and those claims are dismissed.

The Plaintiff also invokes New York Executive law § 296(6), which states: "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." The term "person" includes "one or more individuals, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers." N.Y. Exec. Law § 292(1).

As a preliminary matter, the Court notes that it has not uncovered a successful claim under Section 296(6) against an employer or landlord, rather than an individual participating in the alleged discrimination of that employer or landlord.  However, by its plain terms, claims under Section 296(6) can be brought against corporate entities such as KPM.  The most likely scenario of when such a claim is successful is when the corporate entity is alleged to have "aided and abetted" another entity, not its employee or tenant.

Turning to the substantive law, "[c]laims of discrimination under § 296(6) of the

NYHRL are analyzed under the same framework as is used for the FHA." <u>Rivera v. Inc.</u> <u>Vill. of Farmingdale</u>, No. 06-CV-2613 (DRH)(ARL), 2011 WL 1260195, at *4 (E.D.N.Y. Mar. 30, 2011).

Under § 296(6), an individual or entity must "actually participate[] in the conduct giving rise to a discrimination claim" to be held liable. <u>DiPilato v. 7-Eleven, Inc.</u>, 662 F. Supp. 2d 333, 353 (S.D.N.Y. 2009).  Here, for the reasons explained in conjunction with the Plaintiff's FHA claims against the KPM Defendants, the Plaintiff's claim under Section 296(6) fails as a matter of law.  Again, there is no plausible allegation that the KPM Defendants actually participated in Endres' alleged discriminatory conduct. Accordingly, the Court grants that part of the motion by the KPM Defendants dismissing the Plaintiff's Section 296(6) claim against them.

E.  <u>Negligent Infliction of Emotional Distress</u>

Under New York law, the tort of negligent infliction of emotional distress has four elements: "(1) breach of a duty owed to the plaintiff, which breach either unreasonably endangered the plaintiff's physical safety or caused the plaintiff to fear for his or her physical safety; (2) extreme and outrageous conduct; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." <u>Walia v. Holder</u>, No. 12-CV-5944 (ADS)(SIL), 2014 WL 5820293, at *18 (E.D.N.Y. Nov. 10, 2014).

In this case, even drawing all inferences in favor of the Plaintiff, the Court finds that he has failed to adequately plead the existing common law duty of care owed by the KPM, his landlord, or Downing, its alleged agent, toward him, the tenant.

In New York, "[a] landlord has no [common law] duty to prevent one tenant from attacking another tenant unless it has the authority, ability, and opportunity to control the

actions of the assailant." <u>Britt v. New York City Hous. Auth.</u>, 3 A.D.3d 514, 514, 770 N.Y.S.2d 744, 745 (2d Dep't 2004). KPM's power to evict Endres did not furnish it "with a reasonable opportunity or effective means to prevent or remedy [Endres's alleged] unacceptable conduct, since the incident[s] giving rise to the injuries sustained, and indeed, the pattern of harassment alleged by the plaintiff, arose from a purely personal dispute between the two individuals [citations omitted]." <u>Id.</u> (citation and quotation marks omitted).

Contrary to the Plaintiff's contention, the mere fact that the KPM Defendants were allegedly made aware of the underlying verbal abuse and threats of physical assault did not trigger a common law duty on their part to investigate and intervene.

Accordingly, the Court grants that part of the motion by the KPM Defendants dismissing the Plaintiff's claims of negligent infliction of emotional distress against them.

F. <u>Breach of Contract</u>

"Under New York law, the elements of a cause of action for breach of contract are (1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages suffered as a result of the breach." <u>In re Sona Mobile Holdings Corp.</u>, No. 13CV04702 (LTS)(DCF), 2014 WL 5781101, at *5 (S.D.N.Y. Nov. 6, 2014)(quoting <u>Beautiful Jewellers Private Ltd. v. Tiffany & Co.</u>, 438 F. App'x 20, 21–22 (2d Cir. 2011).

Here, the parties dispute whether the Plaintiff has adequately plead a breach of any terms of the lease or other contract. First, the Plaintiff alleges that KPM breached Part B of a Housing Assistance Payments ("HAP") Contract, which is attached to the complaint, entered into between the Plaintiff and KPM. Section 9(a) of Part B provides,

in pertinent part: "In accordance with applicable equal opportunity statutes, Executive Orders, and regulations: The owner must not discriminate against any person because of race . . . in connection with the HAP contract." (Compl., Exh 6, at 7.)

The Court has not uncovered, nor does the Plaintiff cite, any case where a claim for breach of a HAP contractual discrimination provision was sustained against a landlord or property owner for failure to intervene, whether based on racial animus or not, in response to harassing behavior from a co-tenant. In fact, the Plaintiff cites no cases of a successful HAP breach of contract claim in general.

In any event, the Court finds that the Plaintiff's claim for breach of Section 9(a) of the HAP contract fails as a matter of law because, as explained above, there is no plausible allegation that the KPM Defendants acted, or failed to act, on account of the Plaintiff's race.

In the complaint, the Plaintiff also invokes Paragraph 12 of the April 21, 2010 Lease which, provides that "[b]y paying the rent and observing all the terms and conditions herein, Tenant shall peaceably and quietly have, hold and enjoy the Premises during the term of this Lease." (Compl., at Exh 4.) The Plaintiff now frames the claim as one of breach of the "warranty of habitability" under Paragraph 8 of the April 21, 2010 Rental Agreement and statutorily implied in New York leases. Therefore, the Court deems the Plaintiff to have abandoned his claims based on Paragraph 12 of the April 21, 2010 lease, and dismisses those claims.

Although the complaint makes no specific reference to a "warranty of habitability," implied or otherwise, the Court construes the complaint liberally, as it must on this motion to dismiss, to assert such a claim and determines that notice of this claim

is sufficient. (See Compl. ¶ 70)("Because of [the] Defendants' actions, Mr. Francis was unable to fully use and enjoy the Premises despite having met his rent obligations each month.").  Further, the KPM Defendants had an opportunity to respond to this claim in their reply papers.  For these reasons, the Plaintiff did not need to move for leave to file an amended complaint to assert this claim.

Turning to the merits of this claim, the Court notes that "[p]ursuant to Real Property Law § 235–b, every residential lease contains an implied warranty of habitability which is limited by its terms to three covenants: (1) that the premises are "fit for human habitation," (2) that the premises are fit for "the uses reasonably intended by the parties," and (3) that the occupants will not be subjected to conditions that are dangerous, hazardous or detrimental to their life, health or safety." Solow v. Wellner, 86 N.Y.2d 582,587, 658 N.E.2d 1005 (1995).

The New York Court of Appeals has interpreted this statute broadly, extending a landlord's liability to acts of third parties. Park West Mgt. Corp. v. Mitchell, 47 N.Y.2d 316, 327, 418 N.Y.S.2d 310, 391 N.E.2d 128 (1979).  The lower courts in New York have followed suit. See Elkman v. Southgate Owners Corp., 233 A.D.2d 104, 649 N.Y.S.2d 138 (1st Dep't 1996)(an alleged noxious odor emanating from a retail fish store in an adjacent building neither owned nor controlled by the landlord cooperative corporation may be a breach of the implied warranty of habitability); Sargent Realty Corp. v. Vizzini, 101 Misc.2d 763, 421 N.Y.S.2d 963 (Civ. Ct. N.Y. County 1979) (floods caused by the upstairs tenant on four occasions which the landlord allowed to persist resulted in substantial abatement).

"Although a landlord may lack direct control over the actions of another tenant, courts have often applied the implied warranty of habitability to conditions beyond the landlord's direct control." <u>Upper E. Lease Associates, LLC v. Cannon</u>, 30 Misc. 3d 1213(A), 924 N.Y.S.2d 312 (Dist. Ct. 2011) <u>aff'd</u>, 37 Misc. 3d 136(A), 961 N.Y.S.2d 362 (App. Term 2012).

Furthermore, in <u>Poyck v. Bryant</u>, 13 Misc. 3d 699, 705, 820 N.Y.S.2d 774, 780 (Civ. Ct., New York County 2006), the court held that a tenant's smoking habits may give rise to a duty to act, to prevent "unreasonable interference" with the rights of other tenants.

Also, in <u>Auburn Leasing Corp. v. Burgos</u>, 160 Misc.2d 374, 609 N.Y.S.2d 549 (Civ. Ct, Queens County 1994), following a bench trial, the court held that a landlord breached the statutorily implied warranty of habitability by failing to evict cotenant drug dealers who bullied, harassed, and threatened the tenant and her family.  In that case, the Court noted that  "[t]he defendant-tenant acted reasonably and prudently in vacating the apartment before the expiration of the lease since it became evident that it was not safe for her or her family to live in the apartment any longer." <u>Id.</u> at 377.  However, the Court's determination that the landlord breached the warranty of habitability did not turn on whether the tenant vacated the premises or was constructively evicted.

The Court also considers <u>Regensburg v. Rzonca</u>, 14 Misc. 3d 1221 (A), 836 N.Y.S.2d 489 (Dist. Ct. 2007), an eviction proceeding.  Following a bench trial, the Court found a breach of the warranty of habitability for failure to intervene in response to the harassing behavior of a neighbor.  The Court stated: "The notion of leaving emotionally vulnerable tenants to their own resort, instructing them to (call the police) after being

informed of [the fellow tenant]'s harassing behavior, is inconsistent with a boarding house environment." <u>Id.</u>

Although this case does not involve a boarding house environment, the Court also held, relying on <u>Auburn Leasing Corp.</u>, that "[e]ven without a bargained for duty, case law requires a landlord to protect tenants from being bullied and harassed by other drug dealing tenants." <u>Id.</u> To be sure, there were additional findings against the landlord in that case, including the landlord's pattern of withholding promised "essential services" such as water and electricity. <u>Id.</u>

While the foregoing cases have recognized a cause of action for breach of the statutorily implied warranty of habitability, the Appellate Term, First Department has held that the statutorily implied warranty of habitability "should not be stretched beyond its breaking point to provide a means for recovering damages allegedly caused by the personal animus between a residential tenant" and in that case, a roommate. <u>Cameron v. Aurora Associates, L.P.</u>, 26 Misc. 3d 80, 82, 896 N.Y.S.2d 562 (App. Term 2009)

Similarly, in <u>Freda v. Phillips</u>, 36 Misc. 3d 1231(A), 959 N.Y.S.2d 89 (Just. Ct., Town of Dutchess County, 2012), following a bench trial, the Court dismissed a petition based on a breach of the statutorily implied warranty of habitability. The Court stated as follows:

> The Court invited both sides to provide it with any statutory or case law authority that would support the proposition that the landlord, under the implied warranty of habitability, had to supervise the behavior of co-tenants.
>
> Despite the industry of plaintiff's counsel, she was unable to provide any such clear authority. It is the finding of the Court that the landlady/defendant is under no obligation to be the den mother of her tenants and assure that they get along.

<u>Id.</u> at *2.

This Court respectfully disagrees with this aspect of Freda. As noted above, there is New York case law, including Poyck, Auburn Leasing Corp., and Regensburg, holding that the warranty of habitability includes responding to the behavior of co-tenants.

Further, in Park West Mgt. Corp., the New York Court of Appeals extended this warranty to third parties. If landlords can be liable, in certain circumstances, for tortious and other misconduct by third-parties committed on the premises by individuals or entities not within their direct control, they should logically be held liable, in certain circumstances, for tortious and other misconduct of co-tenants, over whom they enjoy some degree of control.

Having concluded that a tenant may state a claim for breach of the statutorily implied warranty of habitability against a landlord for failure to intervene in response to harassing behavior by a co-tenant, the Court turns to the merits of the claim in this case.

The statutory warranty of habitability set forth in New York Real Property Law § 235–b protects against conditions that materially affect the health and safety of tenants or deficiencies that "in the eyes of a reasonable person . . . deprive the tenant of those essential functions which a residence is expected to provide." Solow, 86 N.Y.2d 582, 588, 635 N.Y.S.2d 132, 658 N.E.2d 1005 (citations and quotations omitted).

Here, at this stage of the litigation, the Court concludes that the Plaintiff has adequately plead a breach of the implied warranty of habitability against KPM. That the Plaintiff elected to renew his lease during the period of complained-of harassment does not, as a matter of law, bar this claim, and the KPM Defendants do not cite any authority to the contrary. Accordingly, the Court denies that part of the motion by the KPM

Defendants to dismiss the Plaintiff's claim for breach of the statutorily implied warranty of habitability against KPM.

As to Downing, the Court declines to consider her declaration submitted in support of the motion to dismiss in which Downing denies that she is an officer or manager of KPM or that she has an ownership interest in the corporation. Such material is extraneous to the Court's consideration of a motion to dismiss.

However, although Downing is a signatory to the underlying lease, she signed it as an agent for KPM, not in her personal capacity. Therefore, the claim for breach of the statutorily implied warranty of habitability against Downing is dismissed. Compare Yarn Trading Corp. v. United Pads & Trim Inc., 118 A.D.3d 600, 601, 988 N.Y.S.2d 622, 623 (1st Dep't 2014)("The deposition testimony, affidavits, and lease agreement also raise triable issues as to whether the individual defendant negotiated, as well as signed, the lease agreement in his personal capacity or only as an agent on behalf of the corporate defendant").

### III.    CONCLUSION

Based on the foregoing reasons, the motion to dismiss filed by the KPM Defendants is granted in part and denied in part. The motion is denied as to the Plaintiff's claims for breach of the statutorily implied warranty of habitability against KPM. The motion is otherwise granted. The Clerk of the Court is directed to terminate Downing as a Defendant.

As noted above, on July 16, 2014, the Clerk of the Court noted the default of Endres. There having been no activity on the docket as to Endres since that date, the Court permits the Plaintiff to file a motion for a default judgment against Endres on or

before May 1, 2015.  Should the Plaintiff fail to do so or to move for an extension, the

Court will dismiss this action as against Endres for failure to prosecute under Rule 41(b).

**SO ORDERED.**

Dated: Central Islip, New York
March 16, 2015

_____*Arthur D. Spatt*_____
   ARTHUR D. SPATT
   United States District Judge